HENRY MINKUS *et al.* Defendants in Error, *vs.* ALLEN B. POND *et al.*—(GEORGE W. McCABE *et al.* Plaintiffs in Error.)

*Opinion filed June 22, 1927—Rehearing denied October 6, 1927.*

1. MUNICIPAL CORPORATIONS—*what provision of zoning ordinance of city of Chicago is not arbitrary or unreasonable.* A provision of the zoning ordinance of the city of Chicago limiting to single-family dwellings a tract of land bordering on Lake Michigan is not arbitrary or unreasonable notwithstanding other tracts bordering on the lake are zoned for apartment buildings and the purchasers claim to have acquired the tract in question for that purpose, where the adjoining subdivision was restricted to residence use by the plat, the tract in question not being included in the subdivision because at that time it was partly submerged by the lake.

2. SAME—*when courts will not disturb zoning provision.* It is primarily the province of the municipal body to which the zoning function is committed to draw the line of demarcation as to the use and purpose to which property shall be assigned or placed, and it is neither the province nor duty of courts to interfere with the discretion with which such bodies are invested except where there is a clear showing of an abuse of that discretion, which is not the case where the question is merely debatable.

DUNCAN, J., dissenting.

WRIT OF ERROR to the Superior Court of Cook county; the Hon. WILLIAM J. LINDSAY, Judge, presiding.

HARRY R. HURLBUT, and SAMUEL B. KING, for plaintiffs in error.

NEWMAN, POPPENHUSEN, STERN & JOHNSTON, PEDEN, KAHN & MURPHY, and O'CONNELL, HERR & ARVEY, (EDWARD R. JOHNSTON, and HENRY JACKSON DARBY, of counsel,) for defendants in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

This case comes to this court by writ of error prosecuted by five owners of residence property situated on Albion avenue east of Sheridan road, in the city of Chicago, to review a judgment of the superior court of Cook county reversing the decision of the zoning board of appeals for that city in refusing to vary the city ordinance zoning for single residence purposes, only, a portion of the property abutting on Albion avenue, and further ordering the city building commissioner to issue a permit to Henry and Pearl Minkus for the construction of a three-story 33-apartment building on the north side of said avenue and immediately adjacent to Lake Michigan.

The material facts shown by the record are, that prior to 1906 B. F. Weber owned the property on either side of Albion avenue between Sheridan road and Lake Michigan, in Chicago. Albion avenue is an east and west street. Weber subdivided a major portion of the property and filed a plat thereof in October, 1906. The west 150 feet of the property on either side of Albion avenue, and located between Sheridan road and an alley extending north and south and parallel therewith, were not included in the Albion subdivision. Neither were two vacant tracts located on either side of the avenue at its east end and immediately

adjacent to Lake Michigan included in the subdivision, and such intention was so expressed and designated on the plat. The proof seems to warrant the statement that when the subdivision was made all except perhaps 30 or 40 feet of the vacant tract referred to as tract "D" and located on the north side of Albion avenue adjacent to the lake, and which is the particular tract here involved, was submerged by the waters of Lake Michigan. As we understand it, tract "D" now extends along the north side of Albion avenue a distance of more than 180 feet. The plat of the subdivision shows fourteen lots on the north side and thirteen lots on the south side of Albion avenue, all but three of which are 50 feet in width. All of the lots in the subdivision were restricted, by covenants in the deeds under which the present owners hold title and by the terms of the recorded plat, for the use of dwellings, only. No flat-buildings or apartment buildings could be erected on any of the lots; only one residence could be placed on each 33⅓ feet of land; a 25-foot set-back building line was designated; and no residence to be constructed could cost less than $5000. Seventeen lots of the subdivision have been occupied for several years prior to 1923 by good, substantial, single-family dwellings. Tract "D" belonged to the Sisters of Charity of the Blessed Virgin Mary, of Dubuque county, Iowa, and in November, 1922, the Sisters contracted to sell the same to one Rosen and wife, who during February, 1923, entered into a contract to sell said tract, with other property, to defendants in error, Minkus and wife. The deed to Minkus and wife was executed direct to them by the Sisters and delivered May 22, 1923. The property purchased by Minkus and wife included tract "D," lots 1, 2 and 3 immediately west thereof in the Albion subdivision, and 177 feet on North Shore avenue immediately north of tract "D."

The zoning commission of the city of Chicago was appointed by the mayor of Chicago in July, 1921, after the

enactment by the State legislature of the Zoning act in June, 1921. The commission made an exhaustive study and survey in furtherance of the problem of zoning the entire city of Chicago and had the matter under consideration for about two years. Many meetings were held with numerous organizations and associations and several hearings had before the commission made its report and recommendations to the city council. It appears the preliminary report of the commission was prepared during the early part of January, 1923, after which several hearings were held by the commission for the purpose of considering complaints made or changes requested by property owners. A brother of Minkus, Weber, the owner of the vacant tract on the south side of Albion avenue adjacent to Lake Michigan, and Minkus' architect, attended some of the public hearings held by the commission when the Albion avenue property was discussed, and were told the properties on both sides of Albion avenue adjoining Lake Michigan were zoned for apartments or apartment hotels. Minkus claims to have relied upon such representation before purchasing tract "D" and in constructing a breakwater costing $18,500, preparatory to starting the construction of an apartment building on tract "D." The final report of the zoning commission, with a proposed zoning ordinance, was submitted to the Chicago city council about March 14, 1923. Apparently an attempt was made to immediately pass the ordinance under a suspension of the rules, but that effort failed, and under a rule of the city council the commission's report was then referred to a committee of the city council. The zoning commission had placed the property in section 5, extending from the city of Evanston on the north to Devon avenue on the south. Use and volume map No. 5 shows the ultimate zoning of the entire district. The commission's report and proposed ordinance suggested the Albion subdivision be zoned as a residence district, the west 150 feet on either side of Albion avenue and also abutting on the east

side of Sheridan road as a commercial district, and the property on either side of Albion avenue adjacent to the lake as an apartment district. The city council on April 5, 1923, passed the zoning ordinance here involved after having made several alterations and changes in the provisions thereof as originally recommended and submitted by the zoning commission during the previous month. Under the city's zoning ordinance as enacted by the city council the property abutting on either side of the east end of Albion avenue and adjacent to Lake Michigan, which includes tract "D" here involved, was zoned as a residence district instead of for apartment use, as recommended by the zoning commission. The use map shows this property to be the only property in district 5 bordering on Lake Michigan zoned for one-family residence purposes. The proof also shows this property to be the only property within the district changed to one-family residence use, and that such change was made without notice to the owners of the tracts affected. However, changes affecting other property were also made about the same time by the council.

Minkus and wife made application to the building commissioner of Chicago for a permit to erect on and facing south on Albion avenue, a 33-apartment building three stories in height, with English basement, to be built in Gothic style of architecture, with face-brick walls on all sides, and trimmed with stone, terra cotta and ornaments. The proposed building was to be equipped with incinerators for the burning of all garbage, with mechanical clothes-driers in the basement so as to prevent outside or roof-drying of laundry, and with oil burners for heating so as to eliminate smoke and soot. The building was to sit back 25 feet from the lot line in order to correspond with the building restriction for all lots on Albion avenue included in the Albion subdivision. The 25-foot lawn in front of the building was to be beautified with flowers and shrubbery, and the design and appearance of the struc-

ture were to be in keeping with the others in the neighborhood. The city building commissioner refused to issue the permit for the reason that the property had been zoned under the city zoning ordinance for one-family residence use. Further hearings were had before the zoning board of appeals in May, 1925. Fifteen of the seventeen residents in the Albion subdivision appeared as objectors to the construction by Minkus of an apartment building on tract "D." After the introduction of evidence at the hearings the board of appeals refused to modify the order or vary the provisions of the zoning ordinance. It adopted a resolution to that effect and later filed a formal decision. Some of the reasons given by the board of appeals for its decision were, that the construction of the apartment building will be a nuisance to those in its immediate vicinity on account of the increase of fire hazard, smoke, danger of spread of diseases, disturbing noises from increased deliveries, and obstruction of light and air. The board further recited briefly that prior building restrictions affected property in the Albion subdivision and that the owners and residents had complied therewith; that the original owner of all the property on Albion avenue, and who platted the Albion subdivision, included all the marketable property therein then capable of being used for building purposes, as the smaller areas along the lake shore were subject to the action of the lake; that in zoning the street or territory existing conditions were taken into account and Albion avenue as previously restricted was zoned for one-family residences; that though the zoning commission did not cover the property east of the subdivision and bordering on the lake with the same restriction, yet when the matter of zoning was considered by the city council's committee on buildings and zoning, the one-family residence use was also impressed upon property abutting upon the east end of Albion avenue to the lake, and the ordinance was passed zoning the street accordingly; that the action of the city council was fair,

reasonable and wise, and the people residing on that one-family residence street would not be disturbed by the hurly-burly, traffic and nuisance which accompany the presence of large apartment buildings in which many families reside. The board also found no financial hardship to the owners of the property. A writ of *certiorari* was sued out of the superior court of Cook county, where further evidence was heard by the court and the cause reviewed. The decision of the board of appeals was reversed by the court and a permit for the construction of the apartment building ordered to be issued. An appeal was prayed, and the trial judge certified the validity of a municipal ordinance, so far as it affects the property here in question, was involved and the public interest required that an appeal be taken direct to this court. No appeal was perfected by the city, and thereafter some of the property owners on Albion avenue sued out a writ of error to this court to review the judgment of the superior court.

It is unnecessary to set out in detail the findings of the trial court, which in the main were contrary to those of the zoning board of appeals. Numerous errors are assigned by plaintiffs in error, and their argument is presented under three headings, the important one of which is that the authority given to municipalities to zone property includes the power to establish districts wherein one-family dwellings, only, may be constructed and used and to exclude therefrom all other uses. Defendants in error do not attack the ordinance as a whole, but contend that the ordinance as it affects the property in question is unconstitutional and void; that it does not operate equally upon all persons or property similarly situated; that the taking of defendants in error's property bears no relation to the public health, safety, morals or welfare, and that it is unreasonable, unjust and discriminatory.

Counsel for defendants in error in several places in their voluminous brief make allegations or insinuations reflect-

ing dishonesty, or at least questionable action, on the part of the city council in changing the zoning of the property in question from apartment use, as recommended by the zoning commission, to residential use. However, we find absolutely no evidence establishing such statements.

This court has previously considered the zoning question, and in the case of *City of Aurora* v. *Burns,* 319 Ill. 84, the court recognized the seeming present necessity of limiting individual activities to a greater extent than formerly and approved the doctrine of reasonable restraint upon the uses to which private property may be devoted. The court said: "The segregation of industries, commercial pursuits and dwellings to particular districts in a city, when exercised reasonably, may bear a rational relation to the health, morals, safety and general welfare of the community. The establishment of such districts or zones may, among other things, prevent congestion of population, secure quiet residence districts, expedite local transportation, and facilitate the suppression of disorder, the extinguishment of fires and the enforcement of traffic and sanitary regulations. The danger of fire and the risk of contagion are often lessened by the exclusion of stores and factories from areas devoted to residences, and, in consequence, the safety and health of the community may be promoted. These objects, among others, are attained by the exercise of the police power." A wealth of authorities are cited in the opinion in support of municipal zoning. The court also said that zoning necessarily involves a consideration of the community as a whole and a comprehensive view of its needs; that an arbitrary creation of districts, without regard to existing conditions or future growth and development, is not a proper exercise of the police power and is not sustainable. The court also appreciated the probability that no general zoning plan could be inaugurated without incurring complaints of hardship in particular instances, and possible meritorious claims that some properties as zoned could be

used more profitably if zoned for other purposes. Every exercise of the police power in respect to the use of land is likely to affect adversely the property interests of somebody.

In a recent zoning case taken to the Supreme Court of the United States the important provision in the ordinance there being considered was the creation and maintenance of residence districts, from which business and trade of every kind, including hotels and apartment houses, were excluded. Several decisions of State courts were cited, including *City of Aurora* v. *Burns, supra.* The court said: "The matter of zoning has received much attention at the hands of commissions and experts, and the results of their investigations have been set forth in comprehensive reports. These reports, which bear every evidence of painstaking consideration, concur in the view that the segregation of residential, business and industrial buildings will make it easier to provide fire apparatus suitable for the character and intensity of the development in each section; that it will increase the safety and security of home life; greatly tend to prevent street accidents, especially to children, by reducing the traffic and resulting confusion in residential sections; decrease noise and other conditions which produce or intensify nervous disorders; preserve a more favorable environment in which to rear children, etc. With particular reference to apartment houses, it is pointed out that the development of detached-house sections is greatly retarded by the coming of apartment houses, which has sometimes resulted in destroying the entire section for private-house purposes; that in such sections very often the apartment house is a mere parasite, constructed in order to take advantage of the open spaces and attractive surroundings created by the residential character of the district. Moreover, the coming of one apartment house is followed by others, interfering by their height and bulk with the free circulation of air and monopolizing the rays of the sun which otherwise would fall upon the smaller homes, and bring-

ing as their necessary accompaniments the disturbing noises incident to increased traffic and business, and the occupation, by means of moving and parked automobiles, of larger portions of the streets, thus detracting from their safety and depriving children of the privilege of quiet and open spaces for play enjoyed by those in more favored localities, until, finally, the residential character of the neighborhood and its desirability as a place of detached residences are utterly destroyed. Under these circumstances apartment houses, which in a different environment would be not only entirely unobjectionable but highly desirable, come very near to being nuisances. If these reasons thus summarized do not demonstrate the wisdom or sound policy, in all respects, of those restrictions which we have indicated as pertinent to the inquiry, at least the reasons are sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." *Village of Euclid* v. *Ambler Realty Co.* U. S. Sup. Ct. October term, 1926.

The validity of the establishment of strictly residential districts in the process of zoning has been held to be within the scope of the police power by the highest courts of the States of Massachusetts, Louisiana, New York, Kansas, Iowa, Wisconsin, Minnesota and California. The Supreme Court of California in *Miller* v. *Board of Public Works,* 38 A. L. R. 1479, said: "We think it may be safely and sensibly said that justification for residential zoning may, in the last analysis, be rested upon the protection of the civic and social values of the American home. The establishment of such districts is for the general welfare because it tends to promote and perpetuate the American home. It is axiomatic that the welfare, and indeed the very existence, of a nation depend upon the character and caliber of its citizenry. The character and quality of manhood and

womanhood are in a large measure the result of home environment. The home and its intrinsic influences are the very foundation of good citizenship, and any factor contributing to the establishment of homes and the fostering of home life doubtless tends to enhancement not only of community life, but of the life of the nation as a whole. The establishment of a single-family residence district offers inducements not only to the wealthy but to those of moderate means to own their own homes. With ownership comes stability, the welding together of family ties and better attention to the rearing of children. With ownership comes increased interest in the promotion of public agencies, such as church and school, which have for their purpose a desired development of the moral and mental make-up of the citizenry of the country. With ownership of one's home comes recognition of the individual's responsibility for his share in the safeguarding of the welfare of the community and increased pride in personal achievement which must come from personal participation in projects looking toward community betterment. It is needless to further analyze and enumerate all of the factors which make a single-family home more desirable for the promotion and perpetuation of family life than an apartment, hotel or flat. It will suffice to say that there is a sentiment, practically universal, that this is so. But few persons, if given their choice, would, we think, deliberately prefer to establish their homes and rear their children in an apartment-house neighborhood rather than in a single-home neighborhood. The general welfare of a community is but the aggregate welfare of its constituent members, and that which tends to promote the welfare of the individual members of society cannot fail to benefit society as a whole. The entrance of one apartment house or flat into a district usually means the entrance of others, and while it may mean an enhancement of value of the adjacent property for the building of similar structures it detracts from the value

of neighboring property for home building. The man who is seeking to establish a permanent home would not deliberately choose to build next to an apartment house, and it is common experience that the man who has already built is dissatisfied with his home location and desires a change. In other words, the apartment house, tenement, flat, and like structures, tend to the exclusion of homes."

In a recent New York decision the court discussed the power to create residential districts devoted to ordinary family residences and excluding large apartment buildings therefrom. (*Wulfsohn* v. *Burden,* 150 N. E. 120.) In that case the territory involved was, prior to the adoption of the zoning regulations, a residential district devoted mostly to private one-family dwelling houses, and the zoning ordinance did not change its residential character or use. A large apartment building was sought to be constructed within the residential district. The court stated, in substance, that the primary purpose of a residence district is safe, healthful and comfortable family life, rather than the development of commercial instincts and the pursuit of pecuniary profits; that zoning authorities should have the right in a residential district to promote these purposes and to protect the people desiring to enjoy these conditions by excluding big apartment houses, whereby the enjoyment of light and air by adjoining property would be impaired, the congestion and dangers of traffic would be augmented on streets where children might be, and the dangers of disease and fires would be increased, to say nothing of other things, such as the destruction of the character of the district as a residential one and the impairment in value of property already devoted to private residences. There would be no object in creating a residential district unless there were to be secured to those dwelling therein the advantages and that immunity from risks and danger which would ordinarily be considered the main benefits of such residence.

It is shown by the record that all property bordering upon or adjacent to Lake Michigan within district No. 5, except that on Albion avenue, was zoned for apartment use. The record also shows that Loyola avenue, a parallel street located one block south of Albion avenue, and North Shore avenue, a parallel street located one block north of Albion avenue, were zoned for apartment use and many apartment buildings were then constructed thereon. It was also shown that four or five other small areas within the city and bordering upon the shore line of Lake Michigan were zoned and occupied as residence districts, and that most of them were, as is the case with Albion avenue except on the lake frontage, almost surrounded with apartment or commercial buildings. The major portion of the Albion avenue property east of Sheridan road, except the west 150 feet abutting on the latter thoroughfare, had been restricted and used for residence purposes for many years, and undoubtedly, as found by the board of appeals, this existing condition was taken into consideration by the zoning commission when making its recommendation to continue this particular territory for dwelling use. So far as we are able to perceive, the zoning commission may as well have also included the two vacant tracts (which include tract "D") bordering on Lake Michigan at the east end of Albion avenue within the same use and impressed those tracts for dwelling purposes. That property was not included in the original plat of the Albion subdivision and was not restricted by either covenant or plat. However, the property was immediately adjacent to the subdivision, was physically a part of the same neighborhood, and abutted on Albion avenue in its extension or continuation to Lake Michigan. The expansion or enlargement of the one-family dwelling region on Albion avenue so as to include the vacant property or tracts between that region and Lake Michigan was not an unfair, unreasonable or arbitrary exercise of the discretion of the city council as shown by the city zoning ordinance. It

would seem that for the zoning authorities to have zoned the east end of Albion avenue for apartment purposes, thereby creating an obstacle to the remainder of the one-family dwelling portion of Albion avenue and destroying its past and intended character, would have been an unreasonable and unfair exercise of power. It is primarily the province of the municipal body to which the zoning function is committed, to draw the line of demarcation as to the use and purpose to which property shall be assigned or placed, and it is neither the province nor duty of courts to interfere with the discretion with which such bodies are invested, in the absence of a clear showing of an abuse of that discretion.

We are unable to say that the ordinance as it affects the property involved herein discloses an unreasonable or arbitrary conclusion and exercise of power on the part of the zoning authorities and that it has no substantial relation to the public health, safety, morals or general welfare. The most that can be said from the record concerning the conclusion and action of the city council is, that whether its determination was an unreasonable, arbitrary or unequal exercise of power is fairly debatable. In such circumstances the settled rule is that a court will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining the question. *Zahn & Ross* v. *Board of Public Works,* U. S. Sup. Ct. Adv. October term, 1926.

In our opinion the city zoning ordinance, so far as the property of defendants in error is concerned, is constitutional and valid and should be enforced.

The judgment of the superior court is therefore reversed.                        *Judgment reversed.*

Mr. JUSTICE DUNCAN, dissenting.