116

(No. 37417.—

CHICAGO TITLE AND TRUST COMPANY, Trustee, Appellee,
vs. THE VILLAGE OF WILMETTE, Appellant.

*Opinion filed February 1, 1963.*

HINSHAW, CULBERTSON, MOELMANN & HOBAN, and
GEORGE H. REDDING, JR., all of Chicago, (JEROME A. FRA-
ZEL, JR., and GEORGE H. REDDING, JR., of counsel,) for ap-
pellant.

RICHARD G. FINN and JAMES PAPPAS, both of Chicago,
for appellee.

Mr. CHIEF JUSTICE SOLFISBURG delivered the opinion
of the court:

The village of Wilmette has perfected this appeal from
a judgment of the circuit court of Cook County which de-
clared its zoning ordinance unconstitutional and void as
applied to a certain parcel of land, title to which is in the
plaintiff, Chicago Title and Trust Company, as trustee,
and authorized the use of the property for the construction
and operation of a gasoline filling station, subject to
enumerated restrictions relating to the structure, advertis-
ing devices, illumination and business hours. Although we
find no certification by the trial judge that the validity of
an ordinance is involved and that the public interest re-
quires a direct appeal to this court, (see: Ill. Rev. Stat.
1961, chap. 110, par. 75(1)(c),) a constitutional question
is involved so as to give us jurisdiction to entertain the
appeal. *La Salle Nat. Bank of Chicago* v. *County of Cook,*
12 Ill.2d 40.

The subject property is located at the southwest corner
of the intersection of Skokie Boulevard and Lake Avenue

which is near both the northern and western village limits. Lake Avenue runs due east and west, while Skokie Boulevard, at this point, runs diagonally in a general southeast to northwest direction and intersects Lake at an angle of approximately 30 degrees. Both carry four lanes of traffic and, at the intersection, traffic lights, cut-offs and islands have been installed at all four corners. Plaintiff's parcel is, roughly, triangular in shape, with most of its frontage (300 feet) abutting on the west side of Skokie, and consists of the east half of lot 6, cut-off and rounded at the north end, and a fragment of lot 5 of Butler's Subdivision, which lots, at one time, were rectangles fronting on Lake. Their fragmentation occurred in 1934 when the State of Illinois condemned land diagonally through the western half of the village for the construction of what is now Skokie Boulevard. Since that time the subject property, as well as the land at the southeast corner of the intersection, has been vacant. Both lots comprising the irregular tract, (which contains about 28,000 square feet,) were formerly zoned for single-family residence purposes but, by a comprehensive ordinance adopted October 20, 1959, their classification was changed to that of a "group house district." The real parties in interest, whose title is held by the plaintiff-trustee, purchased that portion of lot 6 which makes up the disputed tract in May, 1955, and the portion of lot 5 in August, 1957.

About two blocks west of the subject property Lake Avenue crosses over the Edens Expressway at right angles, *via* an overpass. Cloverleafs constructed at the overpass connect Lake with the expressway and it appears that this is the only point of access to and egress from the expressway in the village. The result has been extremely heavy traffic on Lake which is building up year by year. Skokie is also a heavily traveled thoroughfare and traffic counts taken in 1959 and 1960 showed that in the neighborhood of 25,000 vehicles pass through the Lake-Skokie intersec-

tion in the course of 24 hours. For the years 1957 through 1960 there have been, respectively, 25, 14, 25 and 19 accidents at the intersection.

Running northwesterly from its intersection with Lake, Skokie Boulevard also crosses over the Edens Expressway a quarter of a mile away at the northern village limit. Within the confines of the triangle formed by Lake, Skokie and Edens there is a tract of land the extreme southeast portion of which is directly opposite, across Lake, from the rounded northern end of plaintiff's land which abuts on Lake. Located in the latter triangle is one of the cloverleafs for the Edens-Lake intersection, and occupying the balance of the 23-acre tract is the Edens Plaza Regional Shopping Center composed of 23 to 25 retail businesses of varying sizes and parking facilities for approximately 1200 cars. The stores in the area operate all day each day, except Sunday, and three nights a week. Throughout the parking area, which is the specific part of the business district across from plaintiff's land, there are lights which are illuminated on nights the center is open. Until February 16, 1954, this land was also zoned for single-family residence purposes but, on the day named, the village enacted an ordinance withdrawing it from such classification and granting to Carson, Pirie, Scott & Company, the privilege of operating a shopping district thereon.

At the northeast corner of the intersection, "kitty-corner" from plaintiff's land, there is an 8-acre tract occupied by the Thalmann Nursery, from whence there is sold and displayed various kinds of nursery products, gardening supplies and equipment, gifts, pet supplies and the like. In addition, the tract has a parking area to accommodate 70 cars. This business has been conducted there at least since 1945 and while the record is silent as to its zoning history, the village, on the same night it enacted the Carson ordinance, passed another ordinance granting to Thalmann and his wife, their heirs, executors, devisees and assigns, the

right to use the 8 acres for agricultural purposes as a nursery, for the sale of nursery products and for the operation of a landscape business. We note in passing, however, that by the comprehensive zoning ordinance adopted in October, 1959, the Thalmann property was included in an area zoned for single-family residences, so that its present status is apparently that of a legal nonconforming use.

As previously noted the southeast corner of the intersection is vacant and has always been vacant, the land consisting of a small triangle left by the diagonal construction of Skokie Boulevard in 1934.

On the south side of Lake Avenue, extending a block east from the intersection to Hibbard Road, there are four small, modest priced bungalows and then a vacant lot at the corner of Lake and Hibbard. Across the street, on the north side of Lake and extending east from the Thalmann land, is a group of six small bungalows, all of which have been erected since the shopping center was built. From Lake and Hibbard eastward, the Lake Avenue frontage is, with few exceptions, developed by single-family residences for several miles.

Going north from the Lake-Skokie intersection, the shopping district occupies the west side of Skokie all the way to the northern village limit while, on the east side, to the north of the Thalmann property, there is a church and then some residences, all of the latter being separated from Skokie by a high board fence and oriented in such a way as to have their back lots facing the highway and their front lots facing on streets away from the highway.

Immediately west of the subject property, along the south side of Lake Avenue, screened by trees, bushes and shrubs, is an old bungalow. Adjacent to this is a story-and-a-half 2-flat building owned by one Schulemann, who operates a landscaping business therefrom, and photographs show that the yard is used for parking trucks and

kept in an untidy condition. To the west of the Schule-mann property is a vacant lot, approximately 150 feet wide, and next to it is a single-family residence which abuts on Lavergne Avenue to the west and is directly opposite the Lake Avenue entrance to the shopping center. From that point on the west side of Lake is taken up by the Edens Expressway and one of the cloverleafs leading thereto; beyond the expressway, extending to the village's western limit, both sides of Lake are zoned and used for commercial purposes.

Adjoining the plaintiff's land on the south, and extending along the west side of Skokie for about 1500 feet is a residential development known as Wilcrest Manor, which has been built since the development of the shopping center and the heavy traffic pattern at Lake and Skokie. The residences in this subdivision are all constructed so as to face away from the subject property, from Skokie Boulevard, and from the Schulemann and other properties on the south side of Lake heretofore described. And apart from the "facing away," the subdivision is shielded from Skokie, the subject property and the other properties abutting on Lake by a 7-foot stockade fence which traverses the northern and eastern sides of the subdivision. It will be recalled that a portion of plaintiff's land is the east half of lot 6 and, if we interpret the exhibits properly, the stockade fence at this point passes along what would be the boundary between the east and west halves of lot 6. On the opposite side of the fence, where it is adjacent to plaintiff's land, there are the backyards of three residence properties. The purpose of the fence, according to the builder of the subdivision, was to isolate the subdivision from the property to the north, (*i.e.* the plaintiff's property and the properties along the south side of Lake,) which he considered inferior from a residential standpoint, and to protect children residing in the subdivision from the heavy traffic on Skokie.

The subdivision ends at Hibbard Road, and to the south of that point, along the west side of Skokie, there is a series of newly built "group houses," again oriented away from Skokie and separated by a high board fence; then about a block of vacant property to Central Avenue. Between Central and Wilmette Avenue is a series of new, small, modest priced houses, the only residential buildings in the village constructed to face on Skokie. The corner of Wilmette and Skokie is commercial, there being a drug store and a gasoline station on the west side thereof.

Going back to the Skokie-Lake intersection and proceeding south along the east side of Skokie there are: the small, vacant, triangular parcel previously described; a commercial property known as Hammond Gardens, another landscape garden business; a new "group house" development oriented away from Skokie and isolated by another high board fence; an animal hospital continuing for a considerable distance south of Hibbard Road; vacant property extending to Central Avenue, at which point there is one house on Central facing away from Skokie; and then vacant property extending to the Wilmette-Skokie intersection, where there is a gasoline station on the northeast corner.

It would unduly prolong this opinion for no beneficial purpose to detail the testimony of all the witnesses who testified in the case, or to describe the many helpful exhibits received into evidence. In substance, however, expert witnesses testified on behalf of the plaintiff that the subject property was unfit for residence purposes, and that its proper use would be for business and commercial purposes, due to its irregular shape, to the extreme traffic conditions at the intersection, and to the commercial uses already in existence at two corners of the intersection; that it would be economically unfeasible to improve the property with group housing; that the value of the subject property was approximately 5 to 7 times its value for residence purposes;

and that, due to the other commercial uses in the area and the manner in which the subject property has been isolated from the residential development to the south, the commercial use of the property would have a minimal economic effect upon the surrounding properties. Defendant's experts, to the contrary, were of the opinion that the highest and best use of the property was for residential purposes; that traffic at the intersection, while dangerous, would not deter the residential use of the corner; that the greater public good requires the subject property to be developed with group housing so as to serve as a buffer between the single-family residences to the south and the business district to the north; and that the intended commercial use of the property would reduce the value of the adjacent properties, particularly the three residences whose back lots abut the plaintiff's tract. Other experts testified for defendant that to permit a gasoline station to be operated from the subject property would increase the traffic congestion and accident hazards in the Lake-Skokie intersection.

The rules governing the validity of zoning ordinances are familiar and undisputed. For a particular classification to be upheld it must bear a reasonable relation to the public health, safety, comfort, morals or welfare, and one who challenges its validity has the burden of proving it to be arbitrary and unreasonable. (*Gregory* v. *City of Wheaton,* 23 Ill.2d 402.) And although a zoning ordinance may be valid in its general aspects, yet in some circumstances involving a particular piece of property it may be so clearly arbitrary and unreasonable as to result in confiscation in violation of the constitutional rights of the owner. (*Petropoulos* v. *City of Chicago,* 5 Ill.2d 270.) In determining whether or not a zoning ordinance is arbitrary, unreasonable or capricious in its application to a given parcel of land, among the factors to be taken into consideration are the character of the neighborhood, existing uses and zoning

of nearby property, the amount by which property values are decreased, the extent to which the diminution in value promotes the public health, safety, morals or welfare, the relative gain to the public as compared with the hardship imposed upon the individual property owner, the suitability of the subject property for the purpose for which it is zoned, and the length of time the property has remained unimproved, considered in the context of the land development in the area. (*Myers* v. *City of Elmhurst,* 12 Ill.2d 537.) No single factor is controlling but each must receive due consideration, and the fact that there may be a difference of opinion among expert witnesses as to the scope and impact of the various factors does not require a finding that the reasonableness of the ordinance is debatable. (*Hartung* v. *Village of Skokie,* 22 Ill.2d 485.) And though there is a presumption of validity in favor of zoning ordinances, where it is clearly and affirmatively shown that a particular ordinance is unreasonable and confiscating in its application, we will not hesitate to declare it unconstitutional. *Northern Trust Co.* v. *City of Chicago,* 4 Ill.2d 432.

Applying the accepted tests to the testimony and exhibits in the record, it is plainly apparent that plaintiff's property has little suitability or value for the purpose for which it is zoned. The tremendous volume of traffic at the intersection and the extensive commercial uses at two of its corners are factors which in themselves do much to cause the property to be unfit and undesirable for residence purposes and demonstrate the unreasonableness of the classification. Indeed, those building residence properties in the immediate area have taken great pains to orient and isolate their properties away from the traffic and commercial uses, a course all but denied plaintiff by the manner of development, and in so doing have arbitrarily placed plaintiff's land in a position where it takes its character from the commercial uses of the properties at the intersection similarly situated. We have consistently held that zoning

ordinances restricting an area to residential use are void as applied to property within the area which is so situated in relation to a commercial zone as to render it peculiarly unattractive and of little value for residential use. *Krom v. City of Elmhurst,* 8 Ill.2d 104; *Petropoulos v. City of Chicago,* 5 Ill.2d 270.

Significant also in this case is the circumstance that, despite a marked residential building boom in the immediate area and two different types of residential classification, the subject property has remained vacant and has attracted no buyers for residential purposes for a period in excess of 25 years, dating from 1934 when the lots composing it were fragmented by condemnation for Skokie Highway. (Cf. *Tews v. Woolhiser,* 352 Ill. 212.) Defendant insists, however, that the vacancy factor may not properly be considered here in the absence of affirmative proof by plaintiff negating the possibility that the alienation and development of its land had been forestalled by estate, tax or similar litigation. While we are constrained to remark that the burden of proving such matters would logically rest on the defendant, the argument overlooks the proof which shows conveyances of the land and the testimony that it had been posted for sale in the year immediately prior to this suit, during which only commercial buyers expressed any interest in the property.

A zoning ordinance must find its justification in the promotion of the public, health, safety, morals or welfare, and defendant, while agreeing that plaintiff's property is not an ideal residential location, contends that the residential classification is reasonably related to the public welfare and safety in that it will serve to preserve the values of nearby residence properties, and will prevent traffic hazards that would attend the proposed commercial use of plaintiff's land. Evidence bearing on the first ground shows, in substance, that the ordinance substantially diminishes the value of plaintiff's property and, countrariwise,

due to the presence of existing commercial uses and the manner in which new residential construction has been developed, that the use of the property for a gasoline station would have either uncertain or minimal depreciating effect on some nearby residence properties, while enhancing the values of others. Stated otherwise, the hardship to the plaintiff is plain and uncontradicted, while the gain or hardship to nearby property owners is uncertain and minimal and presents little justification for the extreme confiscation of value worked upon the plaintiff's land by the residential classification. Where the public interest is nonexistent or insignificant and the opposing private interest will suffer great injury, we are committed to the tenet that the zoning ordinance is unreasonable and, hence, is violative of due process and equal protection guarantees. *Dalkoff* v. *City of Rock Island,* 17 Ill.2d 342; *Langguth* v. *Village of Mount Prospect,* 5 Ill.2d 49; *Bullock* v. *City of Evanston,* 5 Ill.2d 22.

Nor do we find that traffic conditions at the intersection afford a rational basis for discrimination against the plaintiff's property. While it is the defendant's contention that cars coming and going from the gas station would increase the congestion and accident hazard at the intersection, the same would be true of cars going to and from group housing with the result that the residential classification is not necessary to the end that congestion and accident hazard may be lessened or avoided in any appreciable degree. (Cf. *Exchange Nat. Bank of Chicago* v. *County of Cook,* 6 Ill.2d 419; *Petropoulos* v. *City of Chicago,* 5 Ill.2d 270.) We would add, too, in looking to the reasonableness of defendant's regulation, that the same considerations did not deter it from permitting, by special ordinance, a commercial use of the Thalmann property located at the northeast corner of the intersection.

Both to sustain its ordinance and to undermine the

position of plaintiff to attack it defendant advances the interrelated contentions, first, that purchasers of adjoining property had a right to rely upon the rule that the zoning classification of the subject property would not be changed unless the change was required for the public good and, second, that plaintiff, having purchased its land at residential prices in face of the residential classification may not be heard to attack the reasonableness of the ordinance. As to the first proposition, however, it may be said that adjacent property holders also acquired their property knowing that the classification was subject to constitutional limitations as it applied to other properties, (cf. *Bohan* v. *Village of Riverside,* 9 Ill.2d 561; *Stratford Aire Ass'n* v. *Hibser,* 26 Ill. App. 2d 214;) and as to the second, we have held many times that one who purchases property in the face of a pre-existing classification, while not occupying a favorable position, may attack the validity of such restriction and reap the benefits of its removal. (See: *People ex rel. Chicago Title and Trust Co.* v. *Reiter,* 25 Ill.2d 41, 46; *La Salle Nat. Bank* v. *City of Evanston,* 24 Ill.2d 59, 64; *Trust Company of Chicago* v. *City of Chicago,* 408 Ill. 91, 101.) As was stated in the early zoning case of *Forbes* v. *Hubbard,* 348 Ill. 166, 176: "* * * the purchaser of property after the passage of a zoning ordinance stands in the place of his grantor, and where the grantor had a right to test the validity of the ordinance such right exists in his grantee."

Considering the entire record we do not find that the master or the chancellor placed undue emphasis on particular factors, or omitted consideration of others, and, for the reasons stated, conclude that defendant's ordinance is unconstitutional and void as applied to plaintiff's property. Accordingly, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*