Robert Bartlett and Bernice P. Bartlett, His Wife, Plaintiffs-Appellees, v. City of Chicago, a Municipal Corporation, Defendant-Appellant, and 3440 Lake Shore Drive Apartments, a Partnership, Eric Oldberg, et al., Intervening Defendants.

Gen. No. 49,765.

First District, First Division.

January 25, 1965.

Rehearing denied February 18, 1965.

John C. Melaniphy, Corporation Counsel, of Chicago (Sydney R. Drebin and Marvin E. Aspen, Assistant Corporation Counsel, of counsel), for appellant.

Theodore W. Huszagh, of Chicago, for appellees.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court.

This is an appeal by the defendant, City of Chicago, from a declaratory judgment holding a zoning ordinance unconstitutional as applied to certain property owned by the plaintiffs, Robert Bartlett and Bernice, his wife. Plaintiffs propose to construct a 31 story apartment building which would meet all the requirements of R–7 zoning and conform to the building code of the city.

The subject property known as 525 Hawthorne Place is zoned R–1 single-family residential. In June 1962 the plaintiffs made application to the City Council to rezone the property to R–7 general residential to permit construction of a proposed high-rise apartment building. Although a public hearing was had on the application it languished in committee until, by the provisions of Chicago's Zoning Ordinance, it was deemed denied for lack of final action. Plaintiffs brought suit and judgment was entered in their favor. The defendant appealed directly to the Supreme Court and the case was transferred to this court because the appeal did not present a substantial constitutional question justifying a direct appeal to that Court.

315

Plaintiffs purchased the premises in 1940 for $25,-000 and expended the sum of $20,000 in remodeling. They resided there until 1962 when they closed it up and moved to a new place of residence. The main building is a mansion type house, four stories high containing 20 rooms. It was built in 1910 in the architectural style of that era and designed to accommodate a single family with a minimum of four servants necessary to properly maintain it. On the first floor there is a kitchen and laundry. The second floor has a dining room and butler's pantry. Bedrooms are located on the third floor and servants' quarters on the fourth. The house has no elevators and there are no plumbing facilities on the second floor. There are nine full bedrooms in addition to linen closets, bathrooms and accessory accommodations.

The land consists of approximately one acre with 160 feet frontage on the south side of Hawthorne Place and is 150 feet west of Lake Shore Drive. The Drive at this point is an eight lane express boulevard and also has four inner lanes for local traffic including buses. Just east of the Drive is a major public recreational area and large public boat harbor maintained by the Chicago Park District.

Beginning just north of the "loop" the lake front of Chicago, to a depth of one city block, is zoned for and devoted to the highest residential density permitted by the Chicago Zoning Ordinance. The only exception is the approximately 700 feet of frontage on the interior portion of Hawthorne Place, which is a one block long street beginning at Lake Shore Drive and running west for 1050 feet to Broadway Ave.

When plaintiffs purchased the premises in 1940, Hawthorne Place was zoned and used for single-family residences, with a single exception. This was a 58 foot corner lot at the northwest corner of Hawthorne and Broadway, which was and still is zoned

and used for a 4-story business and apartment building having most of its frontage on Broadway.

Plaintiffs for many years lead the opposition to zoning changes on Hawthorne Place. Meetings of the neighborhood residents opposing the changes were held at their home and they paid all the legal expenses incurred in an attempt to make their opposition effective. Their efforts met with success until about 1954 when they contend "the City Council made a legislative determination (which the courts later followed) that the trend of development in the area was for high-rise development." They cite the following zoning changes and uses as the basis for this contention.

The lot to the east of plaintiffs' property and on the southwest corner of the Drive and Hawthorne Place in 1954 was zoned R–7 and improved with an 18-story high-rise apartment building fronting on Lake Shore Drive and extending 50 feet into Hawthorne. The building's garage and its access driveway abuts the east line of the subject property.

In 1955 the 191 feet of frontage on the northwest corner of the Drive and Hawthorne Place, diagonally and across the street of the subject property, were rezoned R–7. Plaintiffs opposed this change. Later, a declaratory judgment extended this R–7 zoning 50 feet westerly beyond the original 191 feet on Hawthorne. A high-rise apartment building will occupy this site fronting on Lake Shore Drive but extending westerly along Hawthorne and directly across from plaintiffs' property.

On the north side and most westerly portion of the 500 block of Hawthorne Place abutting the B 4–4 building, fronting on Broadway, there are two townhouses. Although the owners of this property sought a change from R–1 to R–7 an agreement was effectuated and the zoning ordinance was amended accordingly. The

317

townhouses were built no higher than 30 feet and landscaped with patio arrangements. They consist of eight dwelling units.

The comprehensive amendment to the Chicago Zoning Ordinance in 1957 rezoned the 150 feet on the southwest corner of Broadway and Hawthorne to B–4.

As to the zoning and uses on the south side of Hawthorne Place (the side where plaintiffs' property is situated) beginning at Lake Shore Drive and proceeding west, we find:

2. The next 750 feet: zoned R–1 and improved with single-family residences as follows:

1. The first 150 feet: zoned R–7 and improved with the modern 18 story apartment building built in 1955, fronting on the Drive and abutting plaintiffs' east lot line with the garage and access driveway on Hawthorne.

(a) The first 160 feet of frontage is the subject property, an acre lot improved with the 20 room brick and stone mansion type house in the front part and a coach house to the rear.

(b) The following 200 feet of frontage is also a one acre lot containing a frame and brick house similar to plaintiffs in size and located near the western side of the lot.

(c) Then the next 200 foot frontage consists of an acre lot improved with a rambling frame house built toward the west end of this lot.

(d) The following 100 foot frontage is a ½ acre lot with a large brick house at its west end.

(e) The next 50 feet is a small lot with a large brick house.

(f) The end 60 feet of R–1 frontage consists of a small lot improved with a small frame house.

3. The end 150 feet on the south side of street: zoned B 4–4 and improved with three older stucco homes on narrow lots at least one of which is currently devoted to multi-family use.

The zoning and uses on the north side of Hawthorne Place beginning at Lake Shore Drive and proceeding west are as follows:

1. First 251 feet: zoned R–7 and consists of two lots, a vacant corner lot and an interior lot improved with a two story brick building (which is to be torn down to provide part of the side for a 36 story apartment building to be built on both lots and to front on the Drive).

2. Next 650 feet: zoned R–1 and improved with eight single-family homes two and three stories high on substantially smaller lots than those on the south side of the street.

3. Next 100 feet: zoned R–7 and improved in 1963 with the eight unit townhouses.

4. End 58 feet: zoned B 4–4 and improved with a relatively old four story apartment building having stores on the ground floor.

All of the Hawthorne Place properties are abutted to the rear by properties zoned R–7. The abutting property to the south of Hawthorne is entirely built up with multi-family apartment buildings ranging in height from three to fourteen stories. The abutting property to the north of Hawthorne is improved with a more varied mixture of uses which run from one to two story single-family homes through low rise walk-up apartments to ten story elevator buildings.

Plaintiffs introduced expert testimony of a zoning and land planner who was the Director of the City's

Planning Staff which prepared the 1957 Comprehensive Amendment to Chicago's Zoning Ordinance. He testified that when the city's zoning ordinance was being prepared, the zoning for the area was designed to reflect existing zoning and usages. He said that the changing character of the neighborhood surrounding the subject property was a result of the whole trend of development along the lake front complex for R–7 high-rise buildings. His opinion was that this was particularly evident in the case of plaintiffs' property in that it was zoned on three sides for high-rise apartments and actually fully surrounded on two sides by a series of four high-rises ranging from 10 to 18 stories in height; that by virtue of the declaratory judgment entered in the past year a lot already improved with a single-family residence across the street and in front of plaintiffs' property was, in effect, rezoned R–7 to authorize the construction of a 36 story high-rise.

On the basis of this existing zoning and usage directly abutting the subject property on three sides, in combination with the already high density R–7 zoning and usage throughout the entire lake front area, and the fact that the existing house on the subject property was obsolete and unusable as a single-family dwelling, his opinion was that the continuation of the single-family zoning of the property would be completely incompatible with surrounding uses and zoning from a planning and zoning standpoint. These factors, he testified, irreversibly impressed the property with an R–7 high-rise character as its highest and best use. Plaintiffs' proposed plan would constitute the highest and best use of the property and give a stable use to the property and the area. In his opinion it would have no detrimental effect on any of the adjoining properties and no overshadowing effect on the single-family residence to the west because

320

there would still be at least 135 feet of open space between it and the proposed building.

Plaintiffs' real estate market expert and appraiser testified that the highest and best use (the only use which would be in keeping with the character of the present surrounding properties) would be for R–7 high-rise. The size, design and location of plaintiffs' house rendered it, for all practical purposes, unusable as a single-family residence except for some unusual situation and it was therefore functionally obsolete. He thought that the development of the property for R–7 high-rise could not change the present character of the neighborhood or devalue the remaining single-family residences on the street because all the elements which determined the present character of the neighborhood were already in existence and their influence had already been felt.

He estimated the value of plaintiffs' property and buildings at a maximum of $40,000 under R–1 zoning and the value of the property alone, at $280,000 if developed under R–7 zoning.

Plaintiffs' third expert, a real estate appraiser, placed a value of $16,000 to $25,000 on the land alone. He gave the buildings no market value for single-family purposes. He felt that if a purchaser were found, the purchase would inevitably be predicated on the possibility of changing the zoning and therefore it would not be purchased for R–1 use, but for speculation. If the land were available for R–7 uses, he placed the valuation at $250,000 to $300,000.

Defendant's expert, a real estate broker, estimated the value of plaintiffs' property at $100,000, although he had not entered the premises and was unable to describe the house other than to give its location and height. He never made any appraisals of Hawthorne Place (property). He based his estimate on his "background experience" in the real estate business.

He felt that the highest and best use for the subject property was single-family residential. The plaintiffs' proposed use would have an adverse effect on the surrounding single-family homes because it would contribute to congestion, heavy street traffic and "other matters that pertain to value of single family dwellings." It would have a substantial depreciating value for the remaining single-family dwellings from twenty to twenty five percent. His view was not only based upon the fact that the building would contribute to heavy street traffic but "on my general knowledge of real estate markets."

A city planner in the Department of City Planning of the City of Chicago testified that from a city planning viewpoint the subject property should remain under R–1 zoning classification. His opinion was based upon the analysis of present frontage on Hawthorne Place and the character of this development and the historical background of the zoning on this street. He said that if a density of the proposed use is allowed to enter into an "enclave" of this type, the single-family character will be eliminated or partially eliminated within the decade based on other similar experience in Chicago and other cities. He said that the existing high-rise developments on the east end of Hawthorne and the townhouses on the west end were not in keeping with the R–1 residences. He felt the 36 story high-rise to be built across the street from the subject property would have an adverse effect on it and the character of the entire block for single-family residences. He disapproved of the existing R–7 now on the block and felt that the city council had erred in granting the R–7 zoning at the east end of Hawthorne on both sides of the street and the R–7 zoning, now the site of the townhouses.

■ ■ The basic rules governing the validity of zoning ordinances are familiar. Although a zoning

322

ordinance may be valid in its general aspects, yet in some circumstances involving a piece of property it may be so clearly arbitrary and unreasonable as to result in confiscation in violation of the constitutional rights of the owner. Chicago Title & Trust Co. v. Village of Wilmette, 27 Ill2d 116, 123, 188 NE 2d 33 (1963). The one who challenges its validity has the burden of proving it to be arbitrary, unreasonable and that it does not bear a reasonable relation to the public health, safety, comfort, morals or welfare. Gregory v. City of Wheaton, 23 Ill2d 402, 178 NE2d 358 (1961).

■ In order to determine whether a zoning restriction is void in its application to a given parcel of land, each case must be decided upon its own particular facts. Krom v. Village of Elmhurst, 8 Ill2d 104, 107, 133 NE2d 1 (1956).

In Hartung v. Village of Skokie, 22 Ill2d 485, 494, 175 NE2d 328 (1961), the Supreme Court said:

> . . . well established are these significant factors in determining the validity of a given zoning of limitation; the character of the neighborhood; the extent to which the value of the subject property is diminished by the limitations; the extent to which the removal of the limitation would depreciate the value of other property in the area; the suitability of the property for the zoned purposes; existing uses and zoning of nearby property; the length of time under the existing zoning that the property has remained unimproved, considered in the context of land development in the area; the relative gain to the public as compared to the hardship imposed on the individual property owner; and the extent to which the ordinance promotes the health, safety, morals or general welfare of the public. (Citations omit-

323

ted.) No one factor is controlling but each must receive due consideration. (Citations omitted.)

In People ex rel. Chicago Title & Trust Co. v. Village of Elmwood Park, 27 Ill2d 177, 188 NE2d 684 (1963), on page 183, the court quoted from its earlier opinion in Weglarz v. Village of Villa Park, 21 Ill2d 202, 205, 171 NE2d 609 (1961) the following:

> "The general rules of zoning law are so familiar as to be axiomatic, and their repetition is no longer necessary for an adequate disposition of questions such as presented here. The issues in this type of legislation are concerned not so much with the development of law as with variations in facts; and the basic problem, like that in negligence and compensation cases, is simply one of applying the same rules over and over, to different factual situations."

Continuing further on page 184 of the opinion, the court said:

> In Hartung v. Village of Skokie, 22 Ill2d 485, we set forth the applicable rules of law and factors to be considered in determining validity. The pertinent factors to be considered in determining the validity of a zoning ordinance as applied to a particular property are the character of the neighborhood, existing uses and zoning of nearby property, the extent, if any, to which property values would be affected by the particular restrictions, the relative gain to the public as compared to the hardship imposed upon the individual property owner, and the suitability of the subject property for the zoned purpose.

The evidence discloses that in spite of the plaintiffs' strenuous opposition, the trend and changing

conditions in the neighborhood were toward high-rise apartment development and away from single-family uses. The effect was to materially lessen the suitability, desirability and value of the subject property for such residential purposes.

■ There is sufficient evidence in the record to indicate that not only are the plaintiffs injured by the substantial diminution in value of the property but also by the inability to economically develop the property by reason of the changes in the area and the zoning restriction. Defendant argues that plaintiffs have suffered no financial loss as a result of the restriction. The evidence is clear that the suitability and desirability of their present use has diminished if not entirely disappeared. The changes and development that have occurred in the general character and present uses in the neighborhood since plaintiffs have acquired the property clearly indicate that their property cannot be profitably developed on a single-family dwelling basis, if at all. Hardship of zoning upon an owner is not confined solely to difference in value because of a restrictive classification, but it may be caused by inability to economically develop the land by reason of the restriction. LaSalle Nat. Bank v. Cook County, 28 Ill2d 497, 500, 192 NE2d 909 (1963). Defendant bases its value estimate upon the testimony of plaintiffs' experts. We are inclined, as was the trial court, to give credence to the testimony of plaintiffs' zoning and real estate experts and believe that the value of plaintiffs' property is decreased substantially by its present zoning classification.

■ There is no contention here that the present zoning operates to protect or conserve the values of other property in the area. LaSalle Nat. Bank v. City of Park Ridge, 23 Ill2d 239, 245, 177 NE2d .837 (1961). Defendant does contend that the record indicates that the value of other single-family resi-

dences on Hawthorne Place will depreciate if the present restriction is removed. Again it was defendant's real estate expert who placed the depreciation at 20 to 25%, although he never made any real estate appraisals on the Hawthorne Place property, nor was he familiar with the neighborhood premises. His view was based upon the fact that the proposed building would contribute to heavy street traffic and his general knowledge of real estate markets. Plaintiffs' experts were of the opinion there would be no detrimental effect and, as one of them said, all of the elements which determined the present character of the neighborhood were already in existence and their influence had already been felt. Considering the evidence in this case in light of the applicable factors, the zoning restriction of single-family residential as applied to plaintiffs' property bears no real and substantial relationship to the public health, safety, morals and welfare, but causes great hardship to the plaintiffs and no gain to the public. The requested use of the property for R–7 high-rise apartment is compatible with the character of the property in the area. We agree with the determination of the trial court that the R–1 single-family classification of plaintiffs' property is unreasonable, confiscatory and unrelated to the public health, safety, morals and welfare.

From the record before us we find nothing to indicate that any public need or consideration demands such a confiscation of values as would be made here. Krom v. City of Elmhurst, 8 Ill2d 104, 115, 133 NE 2d 1 (1956). The hardship to plaintiffs is apparent. On the other hand the gain or detriment to nearby property owners is uncertain, to say the least.

It is our considered judgment that the ordinance which restricts the instant property to single-family use, is unreasonable and void, and has the effect of

depreciating the property to a point of confiscation without correspondingly benefiting the public generally. For these reasons, the judgment of the circuit court is affirmed.

Affirmed.

MURPHY, J., concurs.

BURMAN, P. J., dissenting:

I am unable to agree with the majority of the Court that the R–1, single family zoning classification applicable to the subject property, which property was used for a single family residence by the plaintiffs between 1940 and 1962, should now be declared void and that the plaintiffs should be permitted to erect a high rise building on the premises. Such reclassification is, in my opinion, unreasonable, unjust and discriminatory to all the other single residence property owners in the same situation as the plaintiffs.

The rules governing our disposition of this case are well settled. Zoning ordinances are presumed to be valid. Whoever attacks such ordinances has the burden of overcoming the presumption by proving with clear and convincing evidence that, as applied to him, it is unreasonable and without substantial relation to the public health, morals, safety and welfare. Bennett v. City of Chicago, 24 Ill2d 270, 181 NE2d 96; Jans v. City of Evanston, 52 Ill App2d 61, 201 NE 2d 663. In cases where there is room for a difference of opinion concerning the reasonableness of the zoning classification, the legislative judgment must be conclusive. Urann v. Village of Hinsdale, 30 Ill2d 170, 195 NE2d 643; Standard State Bank v. Village of Oak Lawn, 29 Ill2d 465, 194 NE2d 201; Minkus v. Pond, 326 Ill 467, 158 NE 121; Jans v. City of Evanston, 52 Ill App2d 61, 201 NE2d 663.

Underlying these rules are sound concepts of the proper relation between the courts and the municipal legislative bodies which were well expressed in the Minkus case cited above; there the Supreme Court said: "It is primarily the province of the municipal body to which the zoning function is committed, to draw the line of demarcation as to the use and purpose to which property shall be assigned or placed, and it is neither the province nor the duty of courts to interfere with the discretion with which such bodies are invested, in the absence of a clear showing of an abuse of that discretion." (326 Ill at page 480.)

I believe that the plaintiffs have not met their burden of proof by clear and convincing evidence and that there is clearly room for differences of opinion concerning the reasonableness of the R–1 zoning classification. The record indicates that the subject premises is a part of a single family residential enclave located between a high-rise, high density residential development on the east and a commercial area on the west. The 500 block of Hawthorne, on which the subject premises is located, runs between Lake Shore Drive and Broadway and is zoned R–1 on both the north and south sides of the street. A small western portion of the north side of the street which is contiguous to a B 4–4 area on Broadway was rezoned R–7 to allow the construction of two townhouses containing only eight dwelling units, rising only thirty feet above ground and beautifully landscaped with patio arrangements. There is only one non-conforming use on the block: a high-rise apartment building to be built fronting on Lake Shore Drive which will extend only fifty feet into the block. All the other structures are single family residences and which were being so used at the time plaintiffs purchased the subject premises.

The plaintiffs argue that the present classification is unreasonable because it prevents them from constructing the proposed high-rise apartment building at a substantial economic gain to themselves and at the same time the classification does not bear any relation to the public welfare. I cannot agree that the present classification bears no relation to the public welfare or, at the very least, that on the evidence in the record there can be no room for difference of opinion on this matter. The record contains equally believable expert testimony for and against the proposition that, should the plaintiffs' proposed building be built, the value for residential use of the other property in the enclave would fall. Moreover the defendant's city planner testified without contradiction that from his knowledge of experiences in Chicago and other cities he believed that the residential character of the enclave may be lost within a decade if the plaintiffs' building is constructed. Clearly the public welfare is involved should the construction of the plaintiffs' high-rise, high density apartment building cause depreciation in the residential land values on Hawthorne. Moreover, should construction of this building lead to destruction of this enclave, a positive public benefit may be lost in that the enclave provides a charming, quiet area within a predominantly high density residential complex. Where most of the single family residential owners desire to maintain their property as such, it is a public benefit to preserve these quiet residential enclaves as a contrast to the tendency toward uniformity, impersonality and intensity of high-rise apartment development.

It is clear that the facts that the plaintiffs will be unable to reap a substantial return from their property, unless the zoning classification is changed, and

that their property would be worth more if greater intensity of development were permitted, are not alone sufficient to invalidate the ordinance. LaSalle Nat. Bank v. City of Chicago, 27 Ill2d 278, 189 NE 2d 273. Such facts are not themselves determinative. Hoffmann v. City of Waukegan, 51 Ill App2d 241, 201 NE2d 177; citing Wehrmeister v. County of Du Page, 10 Ill2d 604, 141 NE2d 26, and First Nat. Bank of Lake Forest v. County of Lake, 7 Ill2d 213, 130 NE2d 267.

For these reasons, I believe that there is room for a difference of opinion concerning whether the R–1 classification of the plaintiffs' property is reasonable. In such a case, I do not believe this Court should substitute its judgment for that of the municipal authorities.