LA SALLE NATIONAL BANK *et al.*, Plaintiffs-Appellees, *v.* THE CITY OF PARK RIDGE, Defendant-Appellant.

First District (3rd Division)    No. 76-1594

Opinion filed July 25, 1979.

Nolan, O'Malley and Dunne, of Chicago, and Albert A. Klest, of Park Ridge, for appellant.

R. Marlin Smith and Jeffrey R. Ladd, both of Ross, Hardies, O'Keefe, Babcock and Parsons, of Chicago, for appellees.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:

Following a trial in the Circuit Court of Cook County, a judgment order was entered declaring the zoning ordinance of the defendant, City of Park Ridge, invalid and void with respect to certain property upon which the plaintiffs, La Salle National Bank, as trustee, and McDonald's Corporation, seek to develop a McDonald's restaurant. The order also enjoined the City of Park Ridge and its officials from enforcing the ordinance with respect to the subject property and from interfering with the plaintiffs' development and use of the property according to the plans which had been submitted to the City and to the court. Park Ridge appeals from the order, contending that (1) the trial court erred in applying the standards for judging the validity of the zoning ordinance; (2) the plaintiffs failed to overcome the presumptive validity of the ordinance, and (3) the order is against the manifest weight of the evidence.

The order of the trial court granted relief with respect to count I but denied the relief requested in counts II and III of the plaintiffs' three-count amended complaint. By way of cross-appeal, however, the plaintiffs urge that judgment also be entered in their favor with respect to counts II and III, wherein they sought a declaratory judgment that the zoning ordinance is not only invalid as applied to the subject property, but also void on its face in that it totally excludes carry-out restaurants from the City's B-1 (retail business) district (count II), and that it also totally excludes carry-out restaurants from the entire City of Park Ridge (count III).

In the mid-1950's, La Salle National Bank acquired title, as trustee, to the subject property, an irregularly shaped parcel of land with frontage on Northwest Highway and Oakton Street, which property is part of a triangular section of land formed by the intersections of Northwest Highway, Oakton Street and Fortuna Avenue, in the City of Park Ridge. The property measures approximately 49,000 square feet and at the time of its acquisition by the bank, it was a vacant lot zoned primarily for commercial use. The property was leased to the National Tea Company, and an 11,000 square foot, one-story brick and stone building was erected along the Northwest Highway frontage of the property. By April 1, 1958,

the lessee began operating a National food store from the premises. The remaining portion of the Northwest Highway frontage was developed to provide off-street parking for the food store. The Oakton Street frontage was also developed for off-street parking in connection with the store use pursuant to a zoning variance which changed the status of this portion of the property from its previous residential zoning. For 15 years the property continued to be used as a National food store; throughout this period 94 illuminated off-street parking spaces had been located on the property.

In September 1972 the National Tea Company gave notice to the owners of the property that it was going to close the food store and vacate the subject property by April 1, 1973. Subsequent to the receipt of this notice, the real estate brokerage firm dealing with the property sought to secure another business tenant for the premises. Contacts were made with representatives of various retail businesses in the effort to lease the store building and the adjacent parking facilities. After the National food store closed, a "for rent" sign was posted on the property. Attempts by the management to obtain a new business tenant proved unsuccessful. Therefore, the owners decided to raze the structure and sell the vacant land for redevelopment. The store was demolished in December 1973.

Through "for sale" signs posted on the subject property, inquiries concerning the purchase of the property were invited. The brokerage firm also sought to sell the property through telephone contacts with various parties. Advertisements for the sale of the property were not placed with either print or electronic media, and no listing of the property through outside real estate firms was attempted, except in those instances where a listing was arranged upon the solicitation of an outside broker. An associate of the brokerage firm testified that it was the firm's practice to market its commercial property in the manner applied to the subject site. Prior to the offer by McDonald's Corporation to purchase the property, only one other offer had been made. The sale was not consummated, however, because financing could not be arranged.

In May 1974 the plaintiff entered into a written agreement whereby McDonald's agreed to purchase the property for use as a McDonald's restaurant. The contract set $210,000 as the purchase price of the property and provided that the agreement be subject to "restrictions of record which do not interfere with Purchaser's proposed use of the premises." At the time of the contract for sale the zoning ordinance of the City of Park Ridge classified the subject site in such manner as to allow its use for a restaurant, but only upon the grant of a special use permit. In the fall of 1974, the plaintiffs made application for a special use permit with the plan commission of the City of Park Ridge. In October the commission

recommended that the application be denied. In December 1974 the City's zoning board of appeals also recommended that the permit be denied and the City Council concurred in denying the permit.

Exhausting all remedies available under the municipality's zoning ordinance, the plaintiffs filed this action for declaratory judgment and injunctive relief in March 1975. On September 2, 1975, the City of Park Ridge enacted a new comprehensive zoning ordinance; thereafter, the plaintiffs amended the complaint to reflect the provisions of the new ordinance.

Under the new ordinance the zoning of the subject property was redesignated in such manner as to alter the posture of this case and to provide the basis for the relief requested by the plaintiffs in counts II and III of the amended complaint. The portion of the property fronting on Northwest Highway is now classified as B-1, retail business district. The portion fronting on Oakton Street is now classified R-2, two-family residential. However, the variance previously obtained for this portion of the property allowing it to be used for off-street parking in connection with a retail use of the highway frontage remained intact. Sixty-six retail uses are permitted as a matter of right within the new B-1 classification. Included among these uses are bakery shops, candy stores, ice cream stores, funeral homes, hardware stores, self-service automatic laundries, dry-cleaning establishments, music schools, dance schools and indoor theatres. Restaurants are still allowed within the B-1 zone, but only under special use permits. However, restaurants which "package and serve foods in disposable wrappers and/or containers to be consumed on the premises or in a parked motor vehicle, when such services are a principal part of the business operations" have been excluded. (Park Ridge, Ill., Zoning Ordinance, §8.02, Sept. 2, 1975.) The total exclusion of carry-out type restaurants, such as the contemplated McDonald's restaurant, applies not only to the B-1 district, but to all the zones of the City.

As already noted, the subject property is an irregularly shaped parcel located on the triangle formed by the intersections of three streets. Two of the streets, Northwest Highway and Oakton Street, are major four-lane arterial highways. Along Northwest Highway the property has a frontage of 253 feet and extends southwest at right angles to the highway for a depth of 128 feet; 134.3 feet of the rear line of the Northwest Highway parcel adjoins the parcel running through to Oakton Street. The remaining 118.7 feet of the rear line of this highway parcel abuts residential properties fronting on Fortuna Avenue. The Oakton Street parcel has a 100-foot frontage and it extends north for 209.82 feet along the west line and 117.09 feet along the east line to adjoin the Northwest Highway parcel.

One of plaintiffs' exhibits depicts the land use and zoning in the

vicinity of the subject property. As indicated on that exhibit, 32 separate service and retail business uses are situated along Northwest Highway between Fortuna and Seeley Avenues. Among these uses are three automobile service stations, a grocery store, a pharmacy, and three restaurants. Five of the 32 uses, including two of the restaurants, one of these being a Chicken Unlimited carry-out type restaurant, are situated on the block where the subject property is located. Along Oakton Street, immediately east of the subject property, are six additional commercial type uses. Just west of the property on Oakton Street are a single-family home and two two-family residences. Adjacent to the property and fronting on Fortuna Avenue are three single-family homes. Another carry-out restaurant is located two blocks west of the subject site. The property opposite the site on Oakton Street belongs to the local public school district; however, this property is leased to the Jeanine Schultz School, a private residential school for emotionally handicapped children.

The zoning map introduced into evidence indicates that the surrounding area is predominantly a residentially zoned neighborhood with a mixture of single-family (R-1) and two-family (R-2) parcels. However, most of the property fronting either Northwest Highway or Busse Highway has been zoned for retail business (B-1, B-2) and commercial (B-3) use. As a result of the business and commercial designation of the properties along the two highways, the zoning ordinance contemplates business uses that encroach upon several streets having primarily residential frontage, including Oakton Street and Fortuna Avenue. The zoning map also indicates that several of the existing uses do not conform to the present zoning restrictions. For example, the three automobile service stations and three restaurants at or near the intersection of Northwest Highway and Oakton Street are all nonconforming uses which predate the September 2, 1975, zoning ordinance. Also, the multiple-family apartment houses directly across the highway from the subject site do not appear to conform to the B-1 zoning applicable to that property.

One of the plaintiffs' exhibits depicts McDonald's Corporation's proposed development of the subject property. The restaurant building itself is to be a one-story structure of modern design constructed of masonry with face brick on each of the four sides and contain a mansard style roof of slate shingles. Seating for 125-30 patrons will be provided within the 3400 square-foot building, and 73 off-street parking spaces will be developed on the remainder of the site. Access to the restaurant will be available through two driveways on the Northwest Highway frontage and one on the Oakton frontage. The plan calls for illumination of the property in a manner which will direct the lighting away from the neighboring residential properties. The restaurant will be open for

business between 7 a.m. and 11 p.m., except for Fridays and Saturdays when it will remain open until midnight. The peak hour of operation for the restaurant is anticipated to be between noon and 1 p.m.

The restaurant will provide a limited menu of fast food items, hamburgers, french fries, shakes, and soft drinks, and will be operated in a self-service manner from an inside service counter. No service will be provided directly to patrons waiting in their cars. For patrons wishing to consume their purchases outside the restaurant building or in their cars, items will be provided in disposable wrappers and containers. Waste containers and clean-up crews will be provided by the restaurant, and security personnel will be stationed on the premises. A fence and landscaping will separate the restaurant premises from the residential properties on the block. The single-family home on the 25-foot lot adjacent to the Oakton Street frontage will be buffered by a 29-foot-wide planting of trees and lawn.

Besides the testimony of two of the adjoining homeowners objecting to the proposed development, expert testimony in the areas of planning, appraising, traffic engineering and environmental technology was introduced. Thomas Buckley, a city planning and zoning consultant, testified for the plaintiffs that he was retained by them to review the Park Ridge zoning ordinance and the subject property and its vicinity, and to consider the question of the proposed development in relation to the other uses which might be permitted on the property as a matter of right. Buckley indicated his opinion that the site was characterized by the commercial uses currently existing in the area and by the fact the property itself contained the remnants of a former commercial use. It was also his opinion that the proposed McDonald's would be consistent with the established commercial character of the immediate area and that such use of the property would be the highest and best use.

Buckley considered the Park Ridge B-1 zoning restrictions unreasonable in application to the subject property in that they exclude the McDonald's restaurant while allowing for an extensive list of uses permitted as a matter of right. It was his opinion that some of the permitted uses would have a greater detrimental impact upon the character of the area than the McDonald's. A bakery would generate more odors than the proposed restaurant; a theatre would generate more traffic during certain periods of the day. Buckley also thought it unreasonable to allow an ice cream store on the premises but deny a McDonald's. He noted that an ice cream store also provides food in disposable containers.

The witness noted that in contrast to the 3400-square foot structure proposed by the plaintiffs, a building up to three stories high and as large as 16,000 to 20,000 square feet could be built on the site under the existing

ordinance. Such permitted developments could be built within 20 feet of neighboring residential lots, while the McDonald's building would be no closer than 40 feet at any point. It was his opinion that any adverse impact resulting from the commercial development of the property had already taken place due to the previous commercial use of the land and the existing zoning which contemplated continued commercial utilization. Furthermore, Buckley indicated that the off-street parking and lighting improvements suggested in the McDonald's plan would create no problem and would comply with the standards and requirements of the City applicable to any commercial use of the premises.

The defendant presented the testimony of Gerald Estes, a registered architect and land-use planner. It was this witness' opinion that the proposed restaurant should not be permitted because the through traffic pattern between Northwest Highway and Oakton Street contemplated by the establishment of a McDonald's restaurant would open the way for continued commercial development of the neighboring residential properties. He submitted a site plan of his own for the subject premises which, unlike the McDonald's plan, conformed to the existing restrictions imposed by the zoning ordinance. However, this plan, also unlike the McDonald's plan, called for the closing of existing streets, the condemnation of existing residential buildings and a division of the subject property between office and residential use. The witness' plan had not been submitted to the City for approval, and Estes acknowledged that he had not considered the economic factors involved in developing the site according to his plan. Estes further acknowledged that existing offices in the area were already vacant and that he had not studied the demand for additional office space apart from his general familiarity with the neighborhood.

Ralph Martin, a realtor and real estate appraiser, testified for the plaintiffs that the value of the property under the existing zoning restrictions would be $125,000, and that the value of the property at its highest and best use, which would be the proposed development, would be between $200,000 and $250,000. Martin also testified that his survey of the neighborhood indicated vacancies of existing office space and that the subject site would not be the most desirable location for additional offices.

William McCann, another real estate appraiser, also testified for the plaintiffs. It was his opinion that the value of the property under the existing B-1 restrictions was between $140,000 to $150,000. If the property were developed at its highest and best use, it was his opinion that the value of the property would be $220,000 to $240,000. McCann testified that the development of McDonald's at this location would not result in any additional adverse effect on the value of the adjoining residential

properties because they had been developed while the site was being utilized as a National food store. He further indicated that the nature of the restaurant would minimize any adverse effects in the nature of continued commercial development of the area. This opinion was premised upon a consideration of the size and type of commercial developments which could be constructed on the premises as a matter of right.

Frederick Carlson, also a real estate appraiser, testified for the defendant. He valued the subject property at $200,000 under the B-1 zoning. This figure was based upon an opinion that the fair market value of the property as zoned was about $4 per square foot. Carlson admitted, however, that he had not found a comparable piece of property in the area which had been sold at such a price since the passage of the new zoning ordinance. It was the opinion of this witness that if the restaurant were permitted to open, the residential properties on Fortuna Avenue adjoining the subject site would each decrease in value between $3,000 to $4,000. However, Carlson believed that there would be no effect on the value of the home adjoining the Oakton Street parcel of the site since this property was already exposed to a good deal of traffic. Further, it was his opinion that none of the uses permitted under the existing zoning would adversely affect the neighborhood, even in the event they were to generate a substantial amount of traffic. For example, Carlson agreed that an ice cream store open late at night would bring substantial traffic to the area; nevertheless, he did not believe this would harm the value of the nearby homes because, "there is a different element which patronizes an ice cream shop as a rule than those which patronize McDonald's."

Joseph Zgonina, a registered professional engineer and a consultant on civil and traffic engineering, testified on behalf of the plaintiffs. This witness conducted traffic volume studies on the streets in the vicinity of the subject property and made manual traffic counts which measured the traffic volume and turning movements. From a tabulation of traffic counts, Zgonina was able to determine that the peak traffic hour on the streets adjacent to the subject site was between 4:30 p.m. and 5:30 p.m.

Zgonina studied the amount of site-generated traffic that would be created by the proposed McDonald's. He differentiated between site-generated traffic and driveway volume, indicating the latter to be the number of vehicles moving on and off the site while the former equals the amount of new traffic drawn to the vicinity of the property by the use made of it. Making projections of the amount of traffic that could be generated by each of the uses permitted on the site as a matter of right, Zgonina concluded that the traffic volume on the site's driveway during the peak evening rush hour would range from 55 to 285 cars. The estimated driveway volume for the proposed restaurant during the same

hour was 275 cars, no greater than the volume applicable to some of the permitted uses. During the noon hour, the peak hour for the proposed McDonald's but not for the adjacent streets, the driveway volume estimated by Zgonina was 365 cars.

The witness indicated that a McDonald's restaurant would generate less new traffic than some of the uses permitted as of right. Sixty percent of the driveway volume at a restaurant of the McDonald's type was said to be traffic already on the adjacent streets. In contrast, Zgonina was of the opinion that 85% to 90% of the driveway volume during the evening rush hour at a typical retail establishment is site generated. From these estimates, it was indicated that the proposed development of the property would generate about 110 new vehicular trips during the peak evening hour, while a permitted use of the property could generate as many as 242 such trips during the same period.

Zgonina also conducted a volume gap study at the subject site during the period between 4 p.m. and 6 p.m., covering the peak highway traffic hours. Such a study records the amount of traffic passing a certain point on the street, the number of gaps that occur in that traffic and the time that elapses between the moment a car passes the point and the next car approaches it. Based on this study, Zgonina was of the opinion that highway traffic volume on Northwest Highway and Oakton Street would provide sufficient intervals in the traffic flow to accept vehicles that would be entering and exiting the McDonald's restaurant. The witness also testified that the proposed use of the property would not increase congestion on either of the two streets and that there would be no need for additional traffic control systems.

On cross-examination Zgonina indicated that he had studied how frequently traffic would back up from the intersection of Northwest Highway and Oakton Streets to the subject property. He found in particular that the traffic on Oakton did already back up from Dee Road to just west of the property, but that the traffic never blocked the proposed Oakton Street entrance to the restaurant development. He noted that the curb lane on the south side of Oakton would, during the peak evening rush hour, back up westward from Northwest Highway; however, the inside lane did not back up in this manner and there was room for vehicles to exit from the proposed driveway. While the witness indicated that a McDonald's is a higher traffic generator than some other types of fast food restaurants, he reiterated his opinion that the proposed development would in fact generate less traffic than some of the uses already permitted in the B-1 zone as a matter of right.

James Morton, a civil and traffic engineer, testified for the defendant. Morton indicated that the traffic volume counts made by Zgonina corresponded to those which he had conducted. The witness also

prepared a volume gap study; however, this study was discounted by the witness for technical reasons. He conducted no measurement of site-generated traffic for either the proposed development or the uses permitted on the property as of right. Morton predicted the driveway volume for the McDonald's use to be 755 vehicles during the eight-hour period between 11 a.m. and 7 p.m., and it was his opinion that no permitted use would result in that much traffic. By comparing Zgonina's predictions for the McDonald's driveway volumes with those he measured at the existing commercial establishments in the Crossroads Shopping Center across Northwest Highway from the subject site, the witness concluded that the proposed use would have a detrimental impact on the traffic in the area. Morton found that 39 vehicular movements applied to the shopping center during the noon hour and 117 applied during the evening rush hour. However, the figure for the evening hour did not in fact represent the capacity of the center, since about 40% of the businesses there were closed during the critical evening period. Morton agreed that the proposed McDonald's would be sufficiently removed from the intersection of Northwest Highway and Oakton to have no impact on the accident rate at the intersection.

Further information regarding the traffic volume produced by a McDonald's restaurant was presented in the testimony of Donald Johnson, McDonald's Corporation's real estate manager for the Chicago area. Johnson predicted that the first year sales would be about $800,000 for the proposed restaurant, and that the average customer would spend one dollar per visit. The witness indicated that the average car visiting a McDonald's would carry 2.5 passenger-customers. Johnson's figures would suggest that about 320,000 cars would be patronizing the restaurant during the first year of operation. However, Johnson testified that actual studies indicated a daily range of 700 to 800 cars to be a more accurate estimate of the driveway volume. The witness also indicated that the restaurant should expect about a 10% per year increase in sales; however, a corresponding rate of increase in patrons and cars would not be expected because price increases and new products would account, in part, for the increased sales figure.

Kenneth W. Klaren, director of equipment engineering for plaintiff, McDonald's Corporation, described the cooking methods, equipment and exhaust system used by McDonald's. The limited menu used in its restaurant would not produce odors associated with a general menu restaurant, since it does not cook and serve items such as fried onions, grilled fish and chicken. Emissions from the proposed establishment would be in the range between .2 and .5 pounds of particulate matter per hour. There was no indication that such emissions were inordinate or harmful to the environment of the neighborhood.

John Yates, a professional engineer and environmental technician, testified for the defendant that existing levels of carbon monoxide during one eight-hour period near the premises were 10.6 parts per million. The national eight-hour standard was indicated to be 9 parts per million. Yates indicated that the relatively high levels of carbon monoxide in the area during his eight-hour study were the result of traffic on area streets and parking facilities and low wind conditions. The witness predicted that McDonald's generated traffic would cause a 4% increase in the carbon monoxide levels in the vicinity and that the McDonald's driveway volume would produce a 25% increase in the levels on the parking lot itself. Yates acknowledged that his predictions would apply to any use of the premises which has as high a traffic volume as a McDonald's restaurant.

■■ Before responding to the contentions raised by the defendant's appeal, it is appropriate to note that this cause does not present the typical zoning controversy. We are not reviewing a situation where the plaintiff is attempting to establish a retail business or commercial enterprise in an area restricted by zoning to residential or other noncommercial uses. Nor are we concerned, as such, with the reasonableness of allowing restaurants in Park Ridge's B-1 zoning district solely by means of the special use technique. (See *Pioneer Trust & Savings Bank v. County of McHenry* (1968), 41 Ill. 2d 77, 241 N.E.2d 454, *rev'g* 89 Ill. App. 2d 257, 232 N.E.2d 816; *Kotrich v. County of Du Page* (1960), 19 Ill. 2d 181, 166 N.E.2d 601, *appeal dismissed* (1960), 364 U.S. 475, 5 L. Ed. 2d 221, 81 S. Ct. 243.) The present zoning ordinance of the City of Park Ridge prohibits the development of the proposed use on the subject property; consequently, we are concerned with whether the ordinance may be lawfully enforced to effectuate this prohibition. However, the defendant has also suggested that the zoning ordinance is severable to the degree that, if necessary, we can ignore the prohibition of carry-out type restaurants and restore the proposed McDonald's to the permitted categories of special uses. Such a severance would confront us with the question of whether the denial of a special use permit was reasonable in this case. However, it does not matter which way we choose to address the problem, for the standard of review applicable to the denial of a special use permit is equivalent to that applicable in a challenge to the underlying zoning classification. *Perko v. City of Palos Heights* (1971), 1 Ill. App. 3d 505, 274 N.E.2d 652.

■■ The standards for judicial review and the factors for consideration in a challenge to a zoning ordinance are those announced in the case of *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65, and repeated in several subsequent decisions of our supreme court. (See, *e.g., Goffinet v. County of Christian* (1976), 65 Ill. 2d 40, 357 N.E.2d 442; *Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 354 N.E.2d 899;

*County of Cook v. Priester* (1976), 62 Ill. 2d 357, 342 N.E.2d 41; *La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 312 N.E.2d 625.) As indicated in the *La Salle National Bank v. County of Cook* case, "A zoning ordinance is presumptively valid [citation], this presumption may be overcome only by clear and convincing evidence [citation], and the burden of proof is on the plaintiff." (12 Ill. 2d 40, 46.) At the same time, the law has consistently been interpreted to the effect that restrictions on the liberty and right to use one's property according to one's wishes are justified solely by enactments pursuant to the State's police power, enactments having reference to the public health, safety, morals and welfare. (*County of Cook v. Priester*; *Schneider v. Board of Appeals* (1949), 402 Ill. 536, 84 N.E.2d 428.) Thus, the burden of proof is satisfied by a plaintiff who challenges restrictions imposed by zoning when it is demonstrated by clear and convincing evidence that prohibitions resulting directly from an ordinance, or which follow from the denial of a special use permit, have no reasonable or substantial relationship to the public good. *Tomasek v. City of Des Plaines*; *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 349 N.E.2d 399.

Six factors have been considered by our courts to be particularly relevant in reviewing whether zoning restrictions are reasonable as applied to a particular piece of land or unreasonable restraints on the property rights of the owner. As listed in *La Salle National Bank v. County of Cook* these factors are: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public; (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes, and (6) the length of time the property has been vacant as zoned. (12 Ill. 2d 40, 46-47.) Moreover, the care with which a legislative body has planned its land use development also has been considered important in evaluating the reasonableness of the restrictions. *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 167 N.E.2d 406; *La Salle National Bank v. City of Chicago* (1977), 54 Ill. App. 3d 944, 369 N.E.2d 1363.

In challenging the standards utilized by the trial court in evaluating the reasonableness of the land use restrictions imposed upon the plaintiffs herein, the defendant raises several points. The defendant maintains that the court mistakenly characterized the area, gave too much weight to legal nonconforming uses, paid too little attention to the City's efforts to establish, through zoning, a neighborhood retail shopping district, and wrongfully evaluated the significance of any hardship to the plaintiffs in

view of the length of time the property was vacant, the suitability of the property for development as zoned, and the lack of evidence regarding loss of value due to zoning. We shall consider each of these points in turn.

The trial court's characterization of the land uses in the area surrounding the subject property and the problem of the weight assigned to nonconforming uses are related. In announcing its findings the court stated, among other things, that consideration had been given to the existing uses and zoning of nearby properties. The intersection of Northwest Highway and Oakton Street was noted to be approximately 100 feet from the subject site and its four corners were said to be classified for business or commercial use. Also, it was found that the intersection had been developed with several commercial establishments, including a carry-out restaurant, two automobile service stations and another restaurant.

The defendant objects specifically to the finding that the intersection was about 100 feet from the site of the proposed McDonald's, and to the characterization of the area by reference to commercial establishments at or near the intersection which, under the City's zoning ordinance, are legal nonconforming uses. The record, particularly the exhibits, supports the defendant's contention that the intersection itself is considerably more than 100 feet from the subject property; however, this point is hardly sufficient to overcome the characterization of most of the Northwest Highway properties as essentially commercial, both as zoned and used. Indeed, we note that the court's characterization failed to specifically refer to the cleaners and driving school immediately southeast of the subject site and adjacent to the restaurant uses at or near the intersection. The carry-out restaurant, a Chicken Unlimited, on one of the corners of the intersection is in fact situated on a lot within about 150 feet of the subject site.

With respect to the weight assigned to the nonconforming uses in the court's characterization of the nearby properties, little is apparent from the record. Unless the defendant would be correct in contending that the mere mention of these uses is erroneous, there is no way of judging the legal significance assigned to them by the court. However, such a contention is without merit. While a plaintiff may not void a restriction imposed by zoning by pointing to some existing nonconforming uses (*Kellet v. County of Du Page* (1967), 89 Ill. App. 2d 437, 231 N.E.2d 706), it does not mean that such uses should be ignored. Indeed, such uses should be considered in evaluating the total character of the neighborhood and the reasonableness of the zoning scheme under attack:

"[T]he existence of non-conforming uses does not automatically invalidate a zoning ordinance. [Citation.] The impact of those uses upon the area involved is a matter for measurement and appraisal

in each case. Their frequency and character may be such [however] as to make incongruous a zoning classification that fails to take them into account, * * *" (*Kupsik v. City of Chicago* (1962), 25 Ill. 2d 595, 600, 185 N.E.2d 858.) See also *Zenith Radio Corporation v. Village of Mount Prospect* (1973), 15 Ill. App. 3d 587, 304 N.E.2d 754.

There is nothing in the record which would suggest the demise or phasing out of any of the nonconforming uses in the near future. Thus, we believe that the characterization of the neighborhood by reference to these uses was appropriate, and that the true character of the area would not have been reflected had these uses been ignored. Furthermore, as we have already pointed out, the multiple-family residential development opposite the site on Northwest Highway also appears to be a non-conforming residential use situated within the retail business zone. Consequently, a considerable proportion of the nearby property has been permitted to be developed in a manner contrary to the scheme of the existing ordinance. Such a fact would support a finding that there has been a lack of care by the City in thoughtful planning of its land use, a finding made by the trial court but not directly challenged by the City. See *Sinclair Pipe Line Co. v. Village of Richton Park*; *La Salle National Bank v. City of Chicago.*

What has been said regarding the proportion of nonconforming land uses in the vicinity of the subject property and the general character of the area, also applies to the defendant's position that the trial court paid too little attention to the City's attempted development of a neighborhood shopping district. While the Crossroads Shopping Center might be denominated as a neighborhood shopping development, one which attracts and depends upon neighborhood pedestrian and light vehicular traffic, the present character of the entire area is such that a full complement of retail business and commercial establishments, uses generally found in a downtown shopping district, already exist. Such uses are found not only along the Northwest Highway frontage, but also along some of the side streets. Moreover, the present zoning of the area contemplates the continued use and development of a wide range of commercial enterprises, some of which, for example funeral homes and theatres, do not generally fit in with the character of a neighborhood shopping district.

With respect to the significance of the hardship to the plaintiffs by reason of the zoning restrictions, we find no error in the manner in which this factor was considered by the trial court. The record discloses that the subject property was not used from April 1, 1973, to the date of the plaintiffs' agreement in May 1974. From September 1972 until December

1973, when the prior food store structure was razed, there were efforts to secure a tenant for the premises. For six months following the demolition of the prior structure the owners of the property attempted to sell the land for redevelopment. Thus, about 20 months were spent in trying to find a willing and able tenant or purchaser for the premises, and for at least a year the owners were without the benefit of any income from the property, a period of time which cannot be characterized as insignificant. (See *Chicago Title & Trust Co. v. Village of Wilmette* (1963), 27 Ill. 2d 116, 188 N.E.2d 33.) Although the marketing efforts utilized by the management firm acting as agent for the rental or sale of the property were not intense, we find nothing in the record to discredit them in view of the unrebutted testimony which indicated the efforts were according to an established practice.

The defendant refers us to the fact that the asking price for the leasehold of the premises is not given by the record, and suggests that the rent quoted may have been inordinately high, and that this was the reason the owners were unable to rent the property. The evidence, however, does indicate that the size and nature of the structure previously existing on the property were themselves factors causally related to the unsuccessful rental efforts. Also, there is no indication of the price which the owners asked for the property following the abandonment of the rental efforts. Nevertheless, from the fact that there had been a prior offer to purchase, which was not completed because of lack of financing, one can infer that the price asked was within the fair market range and the efforts to sell were in good faith.

Finally, the defendant argues that the court abused the standards for review in not finding a substantial loss in value to the subject property by reason of the zoning restrictions, and by failing to require a showing that the property was not suitable for development as zoned. The defendant suggested that the trial court, in fact, found that the loss in value was "not substantial." Having reviewed the court's findings we cannot agree with this suggestion. What was found to be not substantial, but, nevertheless, significant, was the difference between the value of the property as zoned as opined by the defendant's appraiser, Carlson ($200,000) and the value of the property with the special use as expressed by the plaintiff appraisers, Martin ($200,000 to $250,000) and McCann ($220,000 to $240,000). The evidence relating to the value of the property as zoned given by the plaintiffs' appraisers ranged from $125,000 to $150,000, resulting in a loss between $85,000 and $60,000 when compared with the McDonald's offer of $210,000 to purchase the property with the special use. We cannot conclude that this range of loss would be other than substantial. However, even if the loss were in fact something less than

substantial we would still be faced with the question of whether the public welfare requires any loss whatsoever. *La Salle National Bank v. County of Cook*, 12 Ill. 2d 40, 47-48.

■■ With respect to the suitability of the property for development as zoned, we mention only two factors. First, it is not incumbent upon the plaintiffs to demonstrate that the property is totally unsuitable for development as zoned or that all possible intervening uses would be unsuitable. (*Brunette v. County of McHenry* (1977), 48 Ill. App. 3d 396, 363 N.E.2d 122; *First Nat'l Bk. of Des Plaines v. Cty. of Cook* (1977), 46 Ill. App. 3d 677, 360 N.E.2d 1377.) All that need be shown is the unreasonableness of the restrictions and the reasonableness of the proposed development. (*First Nat'l Bk. of Des Plaines v. Cty. of Cook.*) Secondly, the evidence suggesting the suitability for development as zoned offered by the defendant's witness, Estes, was itself both economically speculative and based upon a plan which required considerable disruption of already existing properties and traffic patterns.

The contentions that the plaintiffs failed to overcome the presumptive validity of the zoning restrictions and that the decision of the court is against the manifest weight of the evidence go hand-in-hand. The above discussion relating to the failure of the court to apply the appropriate standards for review makes it unnecessary for us to treat these contentions in an exhausting manner. Recapitulating, we hold that the trial court appropriately considered each of the relevant factors and committed no error insofar as its decision is supported by ample evidence relating to the existing uses and zoning, the loss of value to the subject property by reason of the zoning restrictions, the suitability of the property for zoned purposes, the length of time the property remained vacant or unused, and the lack of care in the defendant's planning of its land use and development. What remains for us to consider, therefore, is the evidence relating to the reasonableness of the restrictions in promoting the public good, and the degree to which any public benefit might outweigh the harm to the plaintiffs.

■■ In support of the zoning restrictions the defendant points to the depreciation of nearby residential properties, vehicular traffic congestion as a result of the proposed use, and the problem of increased air pollution. The City argues that the prohibition of the restaurant will benefit the general welfare by preventing these particular evils. Each of these evils was the subject of conflicting expert testimony, however, and we will not disturb the trial court's decision in the event it is supported by competent evidence in favor of the plaintiffs' position. Moreover, the fact that there was a difference of opinion among the experts as to these factors does not justify us in finding, contrary to the view of the trial court, that the reasonableness of the ordinance is debatable and, therefore,

within the discretion of the City of Park Ridge to enforce. *Chicago Title & Trust Co. v. Village of Wilmette* (1963), 27 Ill. 2d 116, 124.

The evidence relating to the depreciation of neighboring residential properties was confined to those properties situated on the subject site's block. The two homeowners who testified for the City indicated that they would suffer an economic loss in the event the McDonald's restaurant were to open. However, neither of these witnesses was properly qualified to assess the value of his property in light of the proposed development. Carlson, the defendant's real estate appraiser, was of the opinion that a loss of from $3000 to $4000 would apply to the single-family homes on the Fortuna Avenue side of the block. He also indicated that no depreciation would apply to the home adjoining the site on Oakton Street. In contrast, the plaintiffs' expert witness, McCann, testified that there would be no economic loss to any of the homes because they were already depreciated by reason of the existing commercial zoning of the subject property and the fact that the homes were built during the prior commercial use of the subject site. In fact, McCann was of the opinion that the proposed development would minimize any future commercial development in the area and not lead to the invasion of existing residential properties in the manner some of the uses permitted as a matter of right could. Consequently, the record supports the trial court's decision insofar as there is evidence to show that little or no economic loss to existing properties would result from the proposed development.

The proposed use of the subject premises would result in a serious vehicular traffic problem. Undoubtedly, the McDonald's restaurant would add considerably to the amount of traffic on or near the subject site, and the trial court so found. The fact remains, however, that any retail business or commercial use of the property would result in an increase of traffic. For this reason, traffic, while an important factor to consider, is not entitled to too much weight in the instant case in evaluating the reasonableness of this zoning restriction. (*La Salle National Bank v. Village of Skokie* (1962), 26 Ill. 2d 143, 186 N.E.2d 46; *Northbrook Trust & Savings Bank v. County of Cook* (1977), 47 Ill. App. 3d 879, 365 N.E.2d 433, *cert. denied sub nom. Village of Northbrook v. Northbrook Trust & Savings Bank* (1978), 434 U.S. 1069, 55 L. Ed. 2d 771, 98 S. Ct. 1249.) The evidence presented by the plaintiffs' traffic expert, Zgonina, indicated that some of the uses permitted on the subject property as a matter of right would create an even greater increase in traffic. Furthermore, the evidence would support a finding that the neighborhood streets would tolerate any increase in traffic caused by the development of the restaurant, and that the traffic flow relating to the operation of the restaurant could be handled without additional traffic controls. There was no evidence which would indicate that the proposed

use of the property would present a danger to the safety of pedestrians or vehicular traffic. Consequently, we find no reasonable connection between the defendant's attempts to avoid traffic congestion and the restrictions which have been imposed upon the use of the subject property.

The air pollution issue relates directly to the traffic created by the proposed development. To the extent the ordinance and its resulting restrictions fail to provide a reasonable classification which will result in the leveling off or decrease of traffic flow in the vicinity of the subject property, we fail to see how the ordinance reasonably relates to the purpose of controlling the levels of carbon monoxide emissions resulting from increased traffic. Equivalent problems of air quality control will necessarily accompany any use of the premises which entails the amount of traffic as the use proposed. Such problems have nothing to do with the fact the restrictions are aimed at carry-out restaurants and have no rational relationship to the concern of the City for a clean and healthy environment.

Emissions resulting from the cooking apparatus, of course, do present a problem independent of the traffic. However, even here there appears to be no reasonable justification for the prohibition or scrutiny of restaurants per se. There is no evidence which indicates that the level of emissions resulting from the McDonald's cooking and exhaust facilities will present a harm to the community. Furthermore, emissions and odors which may eventually result in a harm or annoyance to the neighborhood remain subject to control through environmental protection and enforcement agencies or the law of nuisance.

Finding no merit in the defendant's claims relating the prohibition of the McDonald's restaurant to legitimate and reasonable concerns of the police power, and finding the proposed development of the subject property to be in conformity with existing uses of nearby properties, we affirm the order of the circuit court insofar as it granted the relief prayed for by count I of the amended complaint.

In their cross-appeal the plaintiffs pray for judgment in their favor with respect to the issues raised by counts II and III of the amended complaint, counts upon which the trial court declined to grant relief. Count II seeks a declaratory judgment holding the Park Ridge zoning ordinance invalid on its face in that it totally excludes carry-out restaurants from the B-1 district while permitting, as a matter of right, 66 retail business uses having no rational distinction from the use prohibited. Count III seeks judgment declaring the ordinance void in that it excludes carry-out restaurants from being constructed anywhere in the City of Park Ridge.

Ordinarily a zoning ordinance or its resulting restrictions will be set

aside only to the extent necessary to permit the specific use proposed. (*Schultz v. Village of Lisle* (1972), 53 Ill. 2d 39, 289 N.E.2d 614.) However, the instant case is not the ordinary zoning case, and we are of the opinion that both the law and the facts support the plaintiffs' prayer for relief with respect to the issues raised by count II. The trial court's ruling under count I applied solely to the plaintiffs in the present case and their development of a particular piece of land. An order granting relief under count II will eliminate the possibility of future controversies with respect to the development of carry-out restaurant facilities in the City's retail business district.

In *Frost v. Village of Glen Ellyn* (1964), 30 Ill. 2d 241, 195 N.E.2d 616, the supreme court had before it for review a zoning ordinance which permitted, as a matter of right, 62 separate retail business uses in the municipality's B-2 district. Most of the permitted uses are the same as those now permitted in the B-1 district of the City of Park Ridge. The proposed development in the *Frost* case was a drive-in restaurant, where service would be ordered by and delivered to customers in parked cars on the restaurant's premises or where inside service would be provided. Under the Glen Ellyn ordinance such a drive-in facility was allowed only upon the grant of a special use permit. In holding the ordinance void on its face because of its exclusion of drive-in restaurants from the permitted uses in the B-2 zone, and in subjecting them to the special use technique, the court stated:

> "[W]e see nothing inherently different in the character of the business plaintiffs seek to establish on their property, so far as it effects the public interest, from the many other business uses that could be put there as a matter of right under the B-2 business classification. Statutory classifications, even those effected by zoning ordinances, can be sustained only where there are real differences between the classes and where the selection of a particular class, as distinguished from others, is reasonably related to the evils to be remedied by the statute or ordinance. [Citations.]
>
> We fail to see how a drive-in restaurant of the nature here planned is significantly more detrimental to the public health, safety, welfare or morals, than a restaurant fully enclosed within four walls, or than a bakery, a candy or ice cream store, a grocery store, a meat market, a delicatessen, or a retail liquor store and many more of the sixty-two businesses permitted in B-2 districts. And this is particularly true in view of the existing uses along Main Street which characterize and predominate the district. Traffic attracted would be no greater than that attending many of the other uses permissible, and a drive-in restaurant would, in our opinion, have no greater depreciatory effect upon nearby

residence properties, already exposed to the effects of existing businesses, than would a liquor store, a candy shop, an ice cream store, a laundromat, a club or a lodge." (30 Ill. 2d 241, 245-46.) See also *Marquette National Bank v. Village of Oak Lawn* (1965), 57 Ill. App. 2d 31, 206 N.E.2d 531.

We are of the opinion that the facts related in *Frost* are essentially indistinguishable from those in the instant case as evidenced by the record we have already reviewed at length. Moreover, the particular facts involved here make it even more evident that the result declared in *Frost* should control the outcome of this case as well. Unlike *Frost*, the case before us does not involve a drive-in restaurant in the strict sense; rather, it concerns a carry-out facility and the prohibition of the service of food in wrappers and containers when such food is to be consumed not only in a parked car, but anywhere on the premises. Moreover, the ordinance in *Frost* allowed for drive-in restaurants in the B-2 district through the special use permit mechanism; nevertheless, such an allowance did not cure the constitutional infirmity. Here, we are faced not only with the original denial of a special use permit, but also the total prohibition of carry-out restaurants from an essentially retail business district.

■ We conclude, therefore, that the zoning ordinance of the City of Park Ridge is not only invalid as applied to the plaintiffs' property, but wholly unreasonable and void on its face in its exclusion of carry-out restaurants from the B-1 zoning district. This conclusion, in our opinion, makes it unnecessary for us to address the merits of the issue raised by count III of the amended complaint.

Accordingly, and for the reasons above stated, the order of the Circuit Court of Cook County is affirmed with respect to counts I and III of the amended complaint. The order is vacated with respect to count II, and the cause is remanded to the circuit court for entry of an order with respect to count II consistent with the views expressed in this opinion.

Affirmed with respect to counts I and III; vacated with respect to count II, and remanded with directions.

McNAMARA and JIGANTI, JJ., concur.